UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:17-cr-00115-TLN |
| Plaintiff, | |
| v. | **ORDER** |
| PATRICK SLAVIN, | |
| Defendant. | |

This matter is before the Court on the Government's Motion to Involuntarily Medicate Defendant Patrick Slavin ("Defendant").  (ECF No. 72.)  Defendant has filed an opposition (ECF No. 73), and the Government has filed a reply (ECF No. 74).  For the reasons set forth below, the Court GRANTS the Government's motion.

///

///

///

///

///

///

///

1

1      **I.      FACTUAL AND PROCEDURAL BACKGROUND**

2           On July 13, 2017, a grand jury returned an indictment charging Defendant with twelve

3      counts of mail fraud in violation of 18 U.S.C. § 1341 and nine counts of wire fraud in violation of

4      18 U.S.C. § 1343.  (ECF No. 1.)  The indictment alleges Defendant fraudulently solicited

5      investments from acquaintances, only invested a fraction of the money received, and used the rest

6      of the money to pay off past investors or pay his own living expenses.  (*Id.* at 2–3.)  The

7      indictment further alleges the investors lost a total of approximately $1,700,000.  (*Id.* at 3.)

8           Defense counsel retained psychiatrist Dr. Robert Lin, M.D., to conduct a psychiatric

9      evaluation of Defendant.  (ECF No. 73 at 5.)  Dr. Lin conducted personal interviews with

10     Defendant at the Sacramento County Jail on May 18, 2018, for approximately 3.25 hours and on

11     May 25, 2018, for approximately one hour.  (Gov't Ex. 11 at 1.)  Dr. Lin issued a report dated

12     July 30, 2018, in which he diagnosed Defendant with Autism Spectrum Disorder ("ASD") and

13     Unspecified Psychosis.  (*Id.*)

14          As to the ASD diagnosis, Dr. Lin noted Defendant showed a persistent deficit in social

15     communication and social interaction and appeared to be more sensitive to hearing sounds.  (*Id.* at

16     5.)  As to the Unspecified Psychosis diagnosis, Dr. Lin stated Defendant showed two potential

17     psychotic symptoms.  (*Id.*)  First, Dr. Lin concluded Defendant had a delusional system that

18     incorporated both grandiose and paranoid beliefs.  (*Id.*)  Dr. Lin explained Defendant believed

19     "everyone in town" was talking about him and that he had been awarded $5 million dollars in a

20     nonexistent legal case.  (*Id.*)  Second, Dr. Lin asserted Defendant may suffer from hallucinations,

21     as Defendant reported hearing voices telling other inmates about his personal information.  (*Id.* at

22     6.)  However, Dr. Lin was unable to conclude whether the voices were the result of hallucinations

23     or the result of Defendant misinterpreting sounds.  (*Id.*)  Dr. Lin ultimately concluded Defendant

24     was incompetent to stand trial.  (*Id.* at 6.)

25          On October 22, 2018, Defendant's counsel moved for a competency determination

26     pursuant to 18 U.S.C. § 4241(b).  (ECF No. 24.)  On January 9, 2019, the Court issued an order

27     committing Defendant to the custody of the Attorney General to be transported to a medical

28     facility for a psychiatric evaluation and report.  (ECF No. 29.)

Defendant was subsequently evaluated by Dr. Tiffany Smith, Psy.D., a forensic psychologist at the Bureau of Prisons ("BOP") Metropolitan Detention Center in Los Angeles, California ("MDC-LA"). Dr. Smith evaluated Defendant over the course of approximately 45 days. (Hr'g Tr. at 162–164.) Dr. Smith issued a report on May 7, 2019, in which she diagnosed Defendant with Delusional Disorder. (Gov't Ex. 1.) Dr. Smith noted Defendant expressed beliefs consistent with delusions, including a belief that his thoughts and behaviors were being monitored by individuals involved with the intelligence community. (*Id.* at 17.) Dr. Smith noted Defendant's speech was rapid, but not pressured, and he spoke softly such that she often could not hear him. (*Id.* at 13.) Dr. Smith described Defendant as "verbose and circuitous in his accounts." (*Id.*) Defendant denied experiencing auditory hallucinations, but he also expressed knowledge that information gathered during his evaluation was being broadcast in his housing unit. (*Id.* at 14.) Dr. Smith concluded Defendant "likely has a chronic mental condition, delusional disorder, which may not improve over time, even with psychosocial and psychiatric treatment." (*Id.* at 21.) However, she also noted that "a waxing and waning of the preoccupation of delusional beliefs often occurs" and recommended Defendant "be involved in treatment, including both psychosocial and psychotropic medication, if he is to realize improvement of the condition, or prevent deterioration of his mental status." (*Id.*) Dr. Smith concluded Defendant remained incompetent to stand trial. (*Id.*)

The Court held a competency hearing on August 8, 2019. (ECF No. 40.) At the hearing, the Court found Defendant was incompetent to stand trial and ordered that he be committed to the custody of the Attorney General for a period of four months to determine whether there was a substantial probability that in the foreseeable future, Defendant could attain the capacity to permit the proceedings to move forward. (ECF No. 42 (citing 18 U.S.C. § 4241(d)).)

Thereafter, Defendant was transported to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP-Springfield"). Forensic psychologist Dr. Lea Ann Preston Baecht, Ph.D., evaluated Defendant from November 7, 2019 to March 7, 2020, and issued a report on March 9, 2020. (Gov't Ex. 3.) Dr. Preston Baecht noted that Defendant presented as pleasant but acutely psychotic during his initial clinical interview. (*Id.* at 5–6.) She stated his

speech was rapid, pressured, circumstantial (meaning he provided irrelevant details which delayed him getting to the point), and tangential (meaning he often switched topics to discuss things which were only tangentially related). (*Id.* at 6.) She indicated her attempts to interrupt and re-direct him to the questions asked were unsuccessful unless she held up her hand and talked over him for several seconds. (*Id.*) Defendant spoke at length about his delusions, including that powerful families were plotting against him and using technology (i.e., "avatars" and "wave technology") to spy on him and plot against him. (*Id.*) He described these "avatars" as talking to him and others, and he said he heard them call him a "pervert." (*Id.*) He also said they were used for "crowd control" and to incite other inmates against him. (*Id.*) He speculated that he had a chip in his head and reported he received messages from the television. (*Id.*) Dr. Preston Baecht noted that once Defendant was moved to the unlocked housing unit, he attended a weekly competency restoration group and was an attentive and active participant. (*Id.*) She also noted that during clinical interviews, Defendant was able to converse in a coherent, goal-directed fashion when discussing mundane issues, but as soon as he began discussing his delusions, his thoughts became disorganized and it became difficult to follow what he was saying. (*Id.*)

Dr. Preston Baecht stated that during her evaluation period, Defendant presented with delusional ideation, auditory hallucinations, paranoia, and disorganized thinking. (*Id.* at 9.) She stated that unlike Dr. Lin, she did not believe Defendant's description of hearing voices could be due to "more sensitive hearing" rather than auditory hallucinations because Defendant described hearing voices in her presence when there were no other audible sounds. (*Id.* at 10.) She also disagreed with Dr. Smith for two reasons: (1) Defendant's description of the severity and frequency of his auditory hallucinations indicated his symptom is quite prominent; and (2) Defendant often spoke in a disorganized fashion when discussing his beliefs. (*Id.*) According to Dr. Preston Baecht, those symptoms indicate Defendant does not suffer from Delusional Disorder. (*Id.*) Instead, she diagnosed him with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. (*Id.* at 11.) Dr. Preston Baecht concluded Defendant remained incompetent to stand trial. (*Id.*) She opined that Defendant was unlikely to be restored to competency in the absence of antipsychotic medication. (*Id.*)

4

1    Dr. Robert Sarrazin, M.D., the Chief of Psychiatry at MCFP-Springfield, issued a

2    treatment plan dated June 19, 2020. (Gov't Ex. 5.)  Dr. Sarrazin recommended Defendant be

3    involuntarily medicated to restore his competency based on Defendant's refusal to consent to

4    such treatment.  (*Id.*)  After receipt of Dr. Preston Baecht's report and Dr. Sarrazin's treatment

5    plan, the Court scheduled a *Sell* hearing to determine whether Defendant should be involuntarily

6    medicated to restore competency.  The *Sell* hearing took place *in camera* on January 11, 2021

7    through January 13, 2021.  (ECF Nos. 54, 55, 57.)  Dr. Lin, Dr. Smith, Dr. Preston Baecht, and

8    Dr. Sarrazin testified at the hearing.  The Court qualified each of the witnesses as experts

9    pursuant to the parties' stipulation prior to the hearing.  (ECF No. 53.)  The Court will briefly

10   summarize the experts' testimony in turn.

11               A.      Dr. Preston Baecht's Testimony

12   Dr. Preston Baecht has a Ph.D. in clinical psychology.  (Hr'g Tr. at 12.)  She has worked

13   as a forensic psychologist since January 2000 at MCFP-Springfield.  (*Id.*)  On average, Dr.

14   Preston Baecht carries a caseload of 20 to 35 patients, 90 to 95% of whom are at the medical

15   center for competency restoration treatment.  (*Id.* at 13.)  Her general role is to act as a neutral

16   evaluator for the Court.  (*Id.*)  She evaluates defendants' symptoms and whether those symptoms

17   interfere with their competency, and she recommends treatments to restore competency.  (*Id.*)

18   Dr. Preston Baecht testified her diagnosis of Defendant was based on three symptoms he

19   exhibited during the evaluation period: (1) hallucinations; (2) delusions; and (3) disorganized

20   speech.  (*Id.* at 18–20.)  She also testified that, in her opinion, Defendant's symptoms did not fit

21   the definition of Delusional Disorder.  (*Id.* at 21.)  She testified Defendant's hallucinations are

22   "quite prominent" as it is very rare for her to speak with Defendant without him talking about

23   "voices in the air."  (*Id.* at 23.)  She noted as an example that on the morning of the hearing,

24   Defendant told her he heard voices discussing him and his case for several hours.  (*Id.*)  She also

25   testified Defendant described hallucinations that are not consistent with or related to his

26   delusional theme of someone plotting against him.  (*Id.*)  For example, she testified Defendant has

27   heard someone call him a pervert and has also heard things related to him and religion.  (*Id.*)  Dr.

28   Preston Baecht testified that she still sees Defendant routinely and he continues to present with

5

1   very prominent psychotic symptoms indicative of schizophrenia, including auditory

2   hallucinations and disorganized speech. (*Id.* at 23, 36–37, 55.)

3          Dr. Preston Baecht also testified that, in her experience in treating over 100 defendants

4   with court-ordered involuntary administration of medication over the course of 20 years as a

5   psychologist at MCFP-Springfield, the vast majority of defendants with psychotic disorders can

6   be restored to competency with appropriate antipsychotic medication. (*Id.* at 25–27.)  In addition,

7   Dr. Preston Baecht cited a research study (hereinafter, "the Cochrane study") that reviewed 132

8   defendants who were involuntarily medicated with antipsychotic medication and concluded that

9   79% were successfully restored to competency. (*Id.*)  Dr. Preston Baecht agreed that a limitation

10  of the Cochrane study was that it was not randomized and did not include a placebo-control

11  group. (*Id.* at 121–122.)  However, she testified that doing so would neither be practical nor

12  ethical in the case of pretrial defendants in need of medication. (*Id.*)

13         Dr. Preston Baecht further testified there are no factors indicating Defendant would not

14  respond successfully to antipsychotic medications. (*Id.* at 30–31.)  She noted Defendant does not

15  have an intellectual disability that might reduce his chances of being restored to competency nor

16  does he have a history of not responding to antipsychotic medications. (*Id.*)  She testified

17  antipsychotic medication would be substantially unlikely to cause side effects that would impair

18  Defendant's ability to assist in his defense. (*Id.* at 33.)  She stated that a side effect that would

19  concern her is if medication caused Defendant to be overly sedated. (*Id.*)  However, she stated

20  she does not see that side effect frequently and it can be remedied by adjusting the timing, dosage,

21  or type of medication administered. (*Id.*)  She emphasized Defendant would be closely monitored

22  for any negative side effects. (*Id.* at 34.)

23         Dr. Preston Baecht also testified she did not believe any means less than antipsychotic

24  medication will restore Defendant's competency. (*Id.* at 35–36.)  She testified: "[Defendant's]

25  thought process is simply too disorganized for him to meaningfully participate in any form of

26  psychotherapy, and I don't believe it would make a difference in his symptoms because they're

27  biologically based and they need to be treated with medication in order for them to remit." (*Id.* at

28  35.)  She testified if she were in private practice and a patient presented with Defendant's

6

1    symptoms, she would recommend antipsychotic medication, which is the "gold standard
2    treatment" for someone with psychosis. (*Id.* at 36.)

3                    B.      Dr. Smith's Testimony

4    Dr. Smith has a Psy.D. in clinical psychology. (*Id.* at 157.) She has worked for the BOP
5    since 2008 at MDC-LA. (*Id.*) Dr. Smith's primary responsibility is to conduct court-ordered
6    psychological evaluations of federal inmates. (*Id.* at 158.)

7    Dr. Smith testified regarding her diagnosis of Delusional Disorder. She testified that she
8    understood why Dr. Preston Baecht diagnosed Defendant with Unspecified Schizophrenia
9    Spectrum and Other Psychotic Disorder. (*Id.* at 167–168.) Dr. Smith testified Defendant did not
10   present with auditory hallucinations while he was at MDC-LA. (*Id.* at 171.) Dr. Smith testified
11   that if Defendant presented with her as he did with Dr. Preston Baecht, Dr. Smith likely would
12   have reached the same conclusion as Dr. Preston Baecht. (*Id.* at 177–178.) Dr. Smith also noted
13   that she would recommend psychotropic medication regardless of whether Defendant's diagnosis
14   was Delusional Disorder or Schizophrenia based on her experience working with people suffering
15   from psychotic disorders. (*Id.* at 178.) She testified she would make this recommendation even if
16   Defendant was seeing her as a patient outside the criminal justice system. (*Id.* at 178–179.)

17                   C.      Dr. Sarrazin's Testimony

18   Dr. Sarrazin is an M.D. and the Chief of Psychiatry at MCFP-Springfield. (*Id.* at 203.)
19   He began working as a staff psychiatrist at the medical center in November 2002 and became the
20   Chief of Psychiatry in March 2004. (*Id.*) Prior to working at the medical center, Dr. Sarrazin was
21   a staff psychiatrist at a community health center for approximately ten years. (*Id.*) He is certified
22   by the American Board of Psychiatry and Neurology with subspecialty certifications in forensic
23   psychiatry and consultation-liaison psychiatry. (Gov't Ex. 6 at 1.)

24   Dr. Sarrazin testified he sees Defendant monthly and more often when he does rounds.
25   (Hr'g Tr. at 209.) Dr. Sarrazin testified that based on his interactions with Defendant, he agreed
26   with Dr. Preston Baecht's diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic
27   Disorder. (*Id.* at 210.) Dr. Sarrazin indicated Defendant has displayed delusional thinking,
28   hallucinations, and disorganized thinking during his observations. (*Id.*) Dr. Sarrazin also testified

1  that Dr. Lin's diagnosis of Unspecified Psychosis is essentially the same diagnosis as Dr. Preston

2  Baecht's.  (*Id.* at 211.)   Like Dr. Preston Baecht, Dr. Sarrazin testified that his proposed

3  treatment plan is substantially likely to restore Defendant to competency.  (*Id.* at 219.)  He

4  testified that, in his more than 18 years of experience, approximately 75% of individuals subject

5  to *Sell* orders were restored to competency, which he testified was consistent with literature and

6  studies regarding such individuals.  (*Id.*)  He addressed the Cochrane study cited by Dr. Preston

7  Baecht and agreed with Dr. Preston Baecht that a double-blind, placebo-controlled study would

8  be unethical and impractical in a situation where a judge has issued an order authorizing the

9  involuntary administration of medication.  (*Id.* at 221–222.) However, Dr. Sarrazin also stated

10  the Cochrane study is valuable because it involved individuals in a federal psychiatric prison

11  hospital.  (*Id.* at 222.)

12         Dr. Sarrazin echoed Dr. Preston Baecht's testimony that Defendant does not have a

13  history of failing to respond to antipsychotic medications and does not have an intellectual

14  disability that may reduce the efficacy of such medications.  (*Id.* at 226–227.)  He testified

15  antipsychotic medication was unlikely to cause side effects that would interfere with Defendant's

16  ability to assist in his defense and he can adjust the medication or use other medications to

17  counter any side effects.  (*Id.* at 230–231.)  He emphasized Defendant would be closely

18  monitored for side effects and nursing staff are present 24 hours a day.  (*Id.*)  Dr. Sarrazin

19  testified antipsychotic medication is the least intrusive means to restore Defendant to competence.

20  (*Id.* at 234.)  He explained psychotherapy can be helpful, and other medications can be used as

21  adjunct medications, but treating psychotic symptoms can be done only with antipsychotic

22  medications.  (*Id.* at 234–235.)  Lastly, Dr. Sarrazin testified he would prescribe antipsychotic

23  medications even if he was treating Defendant as a private patient.  (*Id.* at 235.)

24              D.     Dr. Lin's Testimony

25         Dr. Lin has an M.D. and currently works at a state prison in California.  (*Id.* at 304.)  Prior

26  to his current position, Dr. Lin worked at the Sacramento County Jail and spent time in the private

27  sector at a psychiatric hospital.  (*Id.* at 304–305.)  Dr. Lin testified Defendant presented with

28  delusions, but Dr. Lin was uncertain whether or not Defendant was having auditory

hallucinations, in part because of the generally noisy environment at the Sacramento County Jail where the interviews took place.  (*Id.* at 305, 307.)  Dr. Lin testified when he met Defendant in 2018, he would not have considered Defendant's description of hearing voices as prominent.  (*Id.* at 311.)  However, Dr. Lin acknowledged Defendant's condition may have changed in the two years since he interviewed him.  (*Id.*)  As to disorganized speech, Dr. Lin stated he would not have called Defendant's thought processes disorganized, but rather, he "would have labeled them more as part of his delusion."  (*Id.* at 312.)  Dr. Lin confirmed that while his diagnosis was Unspecified Psychosis, Dr. Sarrazin was correct that his official diagnosis should have been Unspecified Schizophreniform or Schizophrenia Spectrum and Other Psychotic Disorder.  (*Id.* at 305.)

At the conclusion of the hearing, the Court set a briefing schedule for argument.  Both parties filed briefs on March 23, 2021.  (ECF Nos. 72, 73.)  The Government filed a reply on April 2, 2021.  (ECF No. 74.)

## II.     STANDARD OF LAW

The Supreme Court has repeatedly "recognized a liberty interest in freedom from unwanted antipsychotic drugs."  *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010) (citing *Sell v. United States*, 539 U.S. 166, 178 (2003); *Riggins v. Nevada*, 504 U.S. 127, 137 (1992); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)).  "Antipsychotic medications are designed to cause a personality change that, 'if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts.'"  *Id.* (citing *United States v. Williams*, 356 F.3d 1045, 1054 (9th Cir. 2004)).  "In addition to the intended changes in cognition and behavior, the drugs 'can have serious, even fatal, side effects.'"  *Id.* (citing *Williams*, 356 F.3d at 1054).  "Accordingly, the Court has 'refus[ed] to permit involuntary medication except in highly specific factual and medical circumstances.'"  *Id.* (citing *United States v. Rivera–Guerrero*, 426 F.3d 1130, 1136 (9th Cir. 2005)).

"[U]nder *Sell*, the government cannot involuntarily medicate a mentally ill defendant for the purpose of rendering him competent to stand trial unless it proves (1) that important governmental interests are at stake; (2) that involuntary medication will significantly further those

9

1    concomitant state interests; (3) that involuntary medication is necessary to further those interests;

2    and (4) that administration of the drugs is medically appropriate." *Id.* (citing *Sell*, 539 U.S. at

3    180–81) (internal quotation marks omitted). "The *Sell* factors do not represent a balancing test,

4    but a set of independent requirements, each of which must be found to be true before the forcible

5    administration of psychotropic drugs may be considered constitutionally permissible." *Id.* (citing

6    *United States v. Hernandez–Vasquez*, 513 F.3d 908, 913 (9th Cir. 2008)). "Because of the

7    importance of the liberty interests implicated by a *Sell* order and the high risk of error, every

8    circuit to address the issue has concluded that the government must bear the burden of proving

9    the relevant facts by clear and convincing evidence." *Id.* at 692.

10        **III.    ANALYSIS**[1]

11            A.    First *Sell* Factor

12        Under the first *Sell* factor, the Court considers whether important governmental interests

13   support prosecuting Defendant. 539 U.S. at 180. The *Sell* Court recognized "[t]he Government's

14   interest in bringing to trial an individual accused of a serious crime is important," but it also noted

15   that "[s]pecial circumstances may lessen the importance of that interest." *Id.* The Court gave

16   examples of "special circumstances" that diminish the Government's interest, such as the effect

17   of the potential delay on the Government's interest in timely prosecution, the length of time the

18   defendant has already been confined, and constitutional requirements of a fair trial. *Id.*

19        The Government estimates Defendant will face a range of 70 to 87 months of

20   imprisonment under the United States Sentencing Guidelines.[2] (ECF No. 72 at 17.) The

21   Government emphasizes the Ninth Circuit has found offenses with substantially lower guideline

22   ───────────

23   [1]    The Ninth Circuit has held that, before proceeding with a *Sell* inquiry, a "district court should make a specific determination on the record that no other basis for forcibly administering medication is reasonably available." *Hernandez-Vasquez*, 513 F.3d at 914. In the instant case, the BOP has indicated that involuntary medication is not warranted based on any threat of danger, and the Government is not seeking involuntary administration of medication on any ground other than *Sell*. (Gov't Exs. 3, 10.) As such, *Sell* appears to be the only basis for forcible medication in this case.

27   [2]    Defendant's estimate mirrors the Government's but includes a three-level reduction for acceptance of responsibility, resulting in an adjusted guideline range of 51 to 63 months of imprisonment. (ECF No. 73 at 8.)

1   ranges to be sufficiently serious under the first *Sell* factor.  (*Id.* at 18.)  The Government also

2   argues the facts of this case confirm Defendant's crimes are serious and no special circumstances

3   lessen the important governmental interest in prosecution.  (*Id.* at 18–19.)

4         The Court agrees with the Government that Defendant has been charged with sufficiently

5   serious crimes to establish an important governmental interest in prosecution.  *Sell*, 539 U.S. at

6   180.  The indictment charges Defendant with twelve counts of mail fraud and nine counts of wire

7   fraud based on a fraudulent investment scheme Defendant carried out for eight years.  (ECF No.

8   1.)  The indictment alleges Defendant's investors lost at least $1.7 million as a result of the

9   scheme.  (*Id.* at 3.)  Defendant's estimated guideline range reflects the seriousness of his crimes

10  and, as the Government correctly points out, the Ninth Circuit has found that lesser guideline

11  ranges indicated sufficiently serious crimes under *Sell*.  *See, e.g.*, *United States v. Onuoha*, 820

12  F.3d 1049, 1055 (9th Cir. 2016) (finding the government had an important interest in prosecuting

13  a defendant with an estimated guideline range of 27 to 33 months); *United States v. Gillenwater*,

14  749 F.3d 1094, 1101 (9th Cir. 2014) (finding the government had an important interest in

15  prosecuting a defendant with an estimated guideline range of 33 to 41 months)).)

16        Defendant does not dispute that he has been accused of a serious crime.  Instead,

17  Defendant contends the Government has a lessened interest in prosecuting him because he has

18  already been in custody for approximately 44 months.  (ECF No. 73 at 8.)  Defendant argues he

19  will be at or near a time-served sentence before he could be restored to competency.  (*Id.* at 9.)

20        The fact that Defendant has been confined for a significant amount of time "does not

21  totally undermine" the Government's important interest in prosecution.  *Sell*, 539 U.S. at 180; *see,*

22  *e.g.*, *Onuoha*, 820 F.3d at 1056 (concluding the fact that the defendant already served more than

23  the minimum guideline range of 27 months — and may conceivably be sentenced to time served

24  once he is restored to competency — did not diminish the governmental interest in prosecuting a

25  serious crime).  The Government still has an important interest in prosecution when a defendant

26  will face a period of supervised release after a term of imprisonment, as is the case here.

27  *Gillenwater*, 749 F.3d at 1101–02 (collecting cases).  Moreover, the Ninth Circuit has indicated

28  that regardless of the time a defendant has already served, "[a] conviction and resulting sentence

serves more purposes than the incapacitation, specific deterrence, and rehabilitation of an individual; general deterrence . . . is also an important consideration." *Onuoha*, 820 F.3d at 1056. In the context of white collar crimes, "general deterrence is particularly important." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense.")). "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.'" *Id.* (citation omitted).

For these reasons, the Court finds the length of Defendant's current confinement does not lessen the Government's important interest in prosecution. Further, there are no other special circumstances that diminish that interest. Nothing in the record indicates Defendant is a candidate for civil commitment, and Defendant has not argued that any delay resulting from the restoration process will interfere with the Government's interest in timely prosecution or his constitutional right to a fair trial. *See Sell*, 539 U.S. at 180. Therefore, the Government has met its burden as to the first *Sell* factor.

## B.   Second *Sell* Factor

Under the second *Sell* factor, the Court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial." 539 U.S. at 181. "At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

### i.   *Substantially Likely to Render Defendant Competent to Stand Trial*

Defendant argues the Government cannot prove by clear and convincing evidence that antipsychotic medication is substantially likely to render Defendant competent to stand trial because there is conflicting evidence as to his actual diagnosis. (ECF No. 73 at 9.) Defendant primarily focuses on the discrepancy between Dr. Smith's diagnosis of Delusional Disorder and

12

Dr. Preston Baecht's later diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.  (*See id.* at 10, 15.)  Defendant argues Dr. Smith's diagnosis is well-supported and Dr. Preston Baecht's diagnosis is not.  (*Id.*)  Defendant then argues "[t]here are no randomized clinical trials (the gold standard) that study the efficacy of antipsychotic medication in treating Delusional Disorder" and therefore — assuming he suffers from Delusional Disorder — "no scientific conclusions can be reached about whether antipsychotic medication will render [Defendant] competent to stand trial."  (*Id.* at 4, 22.)

Both Dr. Smith and Dr. Preston Baecht based their respective diagnoses on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").  The diagnostic criteria for Delusional Disorder are as follows:

(A) the presence of one (or more) delusions with a duration of one month or longer;

(B) *criterion A for Schizophrenia has never been met* (hallucinations, if present, are not prominent and are related to the delusional theme);

(C) apart from the impact of the delusion(s) or its ramifications, functioning is not markedly impaired, and behavior is not obviously bizarre or odd;

(D) if manic or major depressive episodes have occurred, these have been brief relative to the duration of the delusional periods; and

(E) the disturbance is not attributable to the physiological effects of a substance or another medical condition and is not better explained by another mental disorder.

(Dft Ex. A-006 (emphasis added).)

If a patient meets Criterion A for Schizophrenia, he cannot be diagnosed with Delusional Disorder.  (*Id.*)  Criterion A for Schizophrenia requires "[t]wo (or more) of the following, each present for a significant portion of time during a 1-month period (or less if successfully treated).  At least one of which must be (1), (2), or (3):

(1) delusions;

(2) hallucinations;

(3) disorganized speech (e.g., frequent derailment or incoherence);

1    (4) grossly disorganized or catatonic behavior; or

2    (5) negative symptoms (i.e., diminished emotional expression or avolition)."

3    (Dft Ex. A-010.)

4        Defendant first argues Dr. Smith's diagnosis of Delusional Disorder was well-supported.

5    (ECF No. 73 at 10.)  Dr. Smith evaluated Defendant for a period of approximately 45 days in

6    early 2019, during which time she met with Defendant, administered various psychological tests,

7    interviewed BOP staff and counsel for both parties, and reviewed supplemental materials.  (*See*

8    *generally* Gov't Ex. 1.)  Defendant emphasizes Dr. Smith testified hallucinations were not

9    "clearly indicated" during her evaluation. (Hr'g Tr. at 165.)  Defendant then describes the

10   information Dr. Smith was able to obtain from Defendant about his background to argue that

11   "[n]ot once did Dr. Smith indicate that hallucinations were impeding her ability to communicate

12   with [Defendant], nor did she indicate [Defendant's] speech was 'disorganized.'"  (ECF No. 73 at

13   12.)  Defendant essentially argues the absence of hallucinations or disorganized speech precludes

14   a finding of Criterion A of Schizophrenia and therefore supports Dr. Smith's diagnosis of

15   Delusional Disorder.  (*Id.* at 10.)  Defendant also describes other features, such as Defendant's

16   age, ability to function in an occupational setting, and lack of bizarre behavior, that are consistent

17   with Delusional Disorder.  (*Id.* at 13–14.)

18       Defendant next argues Dr. Preston Baecht's diagnosis of Unspecified Schizophrenia

19   Spectrum Disorder is undermined by contrary observations.  (*Id.* at 15.)  In particular, Defendant

20   challenges Dr. Preston Baecht's conclusion that Defendant suffers from "prominent"

21   hallucinations and disorganized thinking.  (*Id.*)  As to hallucinations, Defendant emphasizes Dr.

22   Smith testified Defendant denied hearing hallucinations and did not have the appearance of

23   hearing voices.  (*Id.* at 17.)  Defendant also argues Dr. Lin testified Defendant did not describe

24   hearing voices.  (*Id.*)

25       Defendant goes on to argue even if he did experience auditory hallucinations, that does

26   not foreclose a diagnosis of Delusional Disorder so long as the hallucinations are related to the

27   delusional theme and not "prominent."  (*Id.* at 18 (citing Dft Ex. A-0006).)  Defendant

28   acknowledges that the DSM-5 does not define "prominent."  (*Id.*)  However, he argues if his

14

1    hallucinations were indeed prominent, then other individuals would have observed those

2    hallucinations on a relatively consistent basis.  (*Id.*)  Defendant cites various BOP records from

3    psychology interns and Dr. Sarrazin that do not include any indication of hallucinations over the

4    course of many observations.  (*Id.* at 18–19.)

5           As to disorganized speech, Defendant admits there is some uncertainty "about what

6    disorganized speech actually looks or sounds like."  (*Id.* at 20.)  Defendant argues numerous

7    people who interacted with Defendant during and before that observation period did not observe

8    or document disorganized speech.  For example, Defendant argues Dr. Lin testified an individual

9    displaying a disorganized thought pattern "usually is difficult to follow regardless of what type of

10   question you're asking because it's going to be gibberish."  (*Id.* at 21.)  Dr. Lin testified he did

11   not consider Defendant to have disorganized speech because Defendant's speech only became

12   disorganized when discussing the content of his delusions.  (*Id.*)  Defendant also argues Dr. Smith

13   indicated Defendant had an idiosyncratic way of speaking that made his expressive language

14   difficult to track, but she also indicated Defendant was able to offer information coherently and

15   did not have any difficulties communicating his thoughts.  (*Id.*)

16          Despite Defendant's arguments, the Court finds Dr. Preston Baecht's diagnosis is well-

17   supported.  Dr. Preston Baecht diagnosed Defendant with Unspecified Schizophrenia Spectrum

18   and Other Psychotic Disorder based on three symptoms: (1) delusions; (2) auditory

19   hallucinations; and (3) disorganized speech.  (Hr'g Tr. at 18–20.)  Only two of those symptoms

20   are necessary to satisfy Criterion A of schizophrenia under the DSM-5, which in turn precludes a

21   finding of Delusional Disorder.  (Dft Ex. A-010.)  The parties do not dispute that Defendant

22   suffered from delusions.  The dispute only concerns the finding that Defendant also suffered from

23   hallucinations and disorganized speech.

24          Dr. Preston Baecht evaluated Defendant over the course of four and a half months

25   beginning November 7, 2019, and she has continued to see Defendant routinely since then.

26   (Gov't Ex. 5; ECF No. 62 at 36–37.)  Dr. Sarrazin has also seen Defendant at least monthly

27   during that time.  (Hr'g Tr. at 209.)  Both Dr. Preston Baecht and Dr. Sarrazin agree that

28   Defendant suffers from delusions, prominent hallucinations, and disorganized speech.  (*Id.* at 18,

                                                     15

210.)  Defendant argues hallucinations can also be a symptom of Delusional Disorder so long as those hallucinations are not prominent and are related to the delusional theme.  (ECF No. 73 at 18.)  However, Defendant admits the DSM-5 does not define "prominent," and Defendant offers no overriding authority to persuade the Court that Dr. Preston Baecht's definition is incorrect.  (*Id.*)  When discussing her interactions with Defendant, Dr. Preston Baecht testified, "It is very rare for us to speak, if ever, where [Defendant] does not talk about the voices in the air."  (Hr'g Tr. at 23.)  Dr. Preston Baecht testified that before the *Sell* hearing began, Defendant told her "about the voices he was hearing for the last several hours discussing him and his case."  (*Id.*)  Dr. Preston Baecht also testified that Defendant has described voices saying things that are not directly in line with his delusional theme of being plotted against.  (*Id.*)  As an example, Dr. Preston Baecht stated Defendant reported people calling him "pervert" and reported hearing things related to him and religion.  (*Id.*)  Dr. Preston Baecht and Dr. Sarrazin's testimony supports a finding that Defendant's hallucinations were "prominent" such that a Delusional Disorder diagnosis would be inappropriate.  (Dft Ex. A-006.)

Dr. Preston Baecht and Dr. Sarrazin's finding that Defendant suffered from disorganized speech is also well-supported.  The DSM-5 provides examples of disorganized speech as occurring when individuals switch "from one topic to another" or their "answers to questions may be obliquely related or completely unrelated."  (Dft Ex. A-004.)  The DSM-5 requires the symptom to be "severe enough to substantially impair effective communication."  (*Id.*)  Dr. Preston Baecht testified Defendant often speaks for 15 to 20 minutes in a nonsensical manner.  (Hr'g Tr. at 20.)  Under the DSM-5, this appears to be sufficient to support a finding of disorganized speech.  Although neither Dr. Smith nor Dr. Lin indicated Defendant suffered from disorganized speech, both doctors acknowledged Defendant's symptoms could have changed since their evaluations.  (*Id.* at 181, 311.)  While Defendant argues he does not have disorganized speech because he is capable of coherently discussing various subjects and only becomes disorganized when discussing the content of his delusions, Defendant does not provide any such limitation within the DMS-5's definition.  (ECF No. 73 at 21; *see* Dft Ex. A-004.)

///

Defendant heavily relies on Dr. Smith's diagnosis of Delusional Disorder.  However, Dr. Smith testified Defendant did not present with the same symptoms during her evaluation as he did during Dr. Preston Baecht's subsequent evaluation.  (Hr'g Tr. at 171.)  Importantly, Dr. Smith testified that if Defendant presented with her as he did with Dr. Preston Baecht, Dr. Smith likely would have reached the same conclusion as Dr. Preston Baecht.  (*Id.* at 177–178.)  Dr. Smith acknowledged, "I don't think [] any of the three experts that evaluated [Defendant] in this case were wrong.  I think that we all got different snapshots of [Defendant] over various periods of time, and I think it was progressively longer snapshots."  (*Id.* at 181.)

Dr. Lin evaluated Defendant for an even shorter snapshot of time than Dr. Smith — approximately 4.25 hours over the course of two interviews at the Sacramento County Jail.  (Gov't Ex. 11 at 1.)  However, it bears mentioning that Dr. Lin's opinion does not wholly contradict Dr. Preston Baecht's.  Dr. Lin observed Defendant suffered from delusions and "possible" hallucinations.  (*Id.* at 5–6.)  Indeed, Dr. Lin and Dr. Sarrazin clarified during their testimony that Dr. Lin's diagnosis was essentially the same as Dr. Preston Baecht's.  (Hr'g Tr. at 211, 305.)

Because the Government has provided clear and convincing evidence that Defendant suffers from delusions, hallucinations, and disorganized speaking — and therefore meets Criterion A for Schizophrenia — Defendant's argument that he suffers from Delusional Disorder is not supported by the existing record.  (*See* Dft Exs. 006, 010.)  Therefore, Defendant's remaining arguments challenging the efficacy of treating Delusional Disorder with antipsychotic medication are irrelevant.  Defendant does not make any arguments challenging the efficacy of treating Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.  Out of an abundance of caution, however, the Court will address Defendant's arguments as to the Cochrane study cited by Dr. Preston Baecht and Dr. Sarrazin.

The Cochrane study was an empirical study that found over 79% of 132 pretrial *Sell* defendants were restored to competency when involuntarily treated with antipsychotics.  (Gov't Ex. 13.)  Defendant emphasizes the Cochrane study was not a randomized controlled or double-blind, placebo-controlled study.  (ECF No. 73 at 22–23.)  Defendant also cites *Ruiz-Gaxiola*, in

17

which the Ninth Circuit reversed a district court's *Sell* order in part because the government failed to provide clear and convincing evidence that medication was substantially likely to restore a defendant diagnosed with Delusional Disorder to competency.   623 F.3d at 700–701; (*Id.* at 24). However, *Ruiz-Gaxoila* is distinguishable from the instant case.   In *Ruiz-Gaxoila*, the Ninth Circuit criticized the government experts' reliance on a research study called "the Herbel study," which examined the outcomes of 22 federal prisoners diagnosed with Delusional Disorder and treated with antipsychotic medication.   *Id.* at 697–698.   The defense called an expert who testified that because the study did not involve a control group, it "lacked sufficient scientific validity to support any firm conclusions about the efficacy of involuntary medication in treating detainees with Delusional Disorder."   *Id.* at 698.   The Ninth Circuit also emphasized the study itself acknowledged its limitations and that "[a]dditional research is needed to confirm and expand on these findings."   *Id.*   In addition, the defense expert, deemed by the Ninth Circuit to demonstrate "a far superior knowledge base than the government's two 'experts,'" testified that involuntary medication was likely to worsen the defendant's condition rather than restore him to competency. *Id.* at 698–700.

Here, unlike *Ruiz*, Defendant did not call any experts to discredit the Cochrane study or Dr. Preston Baecht and Dr. Sarrazin's expertise.   Although defense counsel attempts to analogize the Herbel study in *Ruiz* to the Cochrane study in the instant case, defense counsel is not an expert qualified to compare the two studies.   Moreover, Defendant — like the *Ruiz* court — frames his concerns about the Cochrane study as it relates to treating Delusional Disorder.   The Court has already found the record supports a finding that Defendant suffers from Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, not Delusional Disorder.   Therefore, a lack of evidence that antipsychotic medications can successfully treat Delusional Disorder is irrelevant in the instant case.

Moreover, Defendant does not specifically argue antipsychotic medications are ineffective at treating Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.   On the other hand, Dr. Preston Baecht and Dr. Sarrazin both testified antipsychotic medication is substantially likely to render Defendant competent to stand trial.   (Hr'g Tr. at 25, 219.)   While Dr. Preston

Baecht and Dr. Sarrazin cited the Cochrane study, they also based their opinions on their own experience treating *Sell* defendants. (*Id.* 25–26, 219.) Lastly, Dr. Preston Baecht and Dr. Sarrazin testified that no indicators suggest Defendant would not respond to medications. (*Id.* at 30–31, 227–228.)

For all these reasons, the Court finds the Government has shown by clear and convincing evidence "that administration of the drugs is substantially likely to render the defendant competent to stand trial." *Sell*, 539 U.S. at 181.

ii.      *Substantially Unlikely to Cause Side Effects that will Interfere*
         *Significantly with Defendant's Ability to Assist Counsel in his*
         *Defense*

Defendant does not argue antipsychotic medication will interfere with his ability to assist in his defense. Rather, Defendant argues broadly that involuntary medication may cause adverse side effects to his overall health. (ECF No. 73 at 26.) Defendant cites the following possible side effects: neuroleptic malignant syndrome (potentially fatal muscle stiffness); tardive dyskinesia (involuntary movement of the tongue and mouth); tremors; akathisia (internal restlessness); sedation; headaches; constipation; and diarrhea. (*Id.*) Defendant also emphasizes he is prediabetic and argues antipsychotic medication can cause diabetes. (*Id.* at 26–27.)

In reply, the Government does not dispute that antipsychotic medications carry a risk of potentially serious side effects. (ECF No. 74 at 8.) However, the Government cites Dr. Preston Baecht and Dr. Sarrazin's testimony that patients at MCFP-Springfield are monitored closely for all side effects. (Hr'g Tr. at 27, 231–232, 266–267.) The doctors further testified that side effects that might interfere with Defendant's ability to assist in his defense — such as sedation — can be managed by changing medications, adjusting dosages, changing when drugs are administered, or prescribing other medications to control the side effects. (*Id.* at 33–34, 231–232.) Dr. Sarrazin testified that more harmful side effects — such as tardive dyskinesia and neuroleptic malignant syndrome — are exceedingly rare. (*Id.* at 266, 277–278, 288.) While the Court is mindful that antipsychotic medication carries some risk of side effects, the Government has shown that antipsychotic medication is substantially unlikely to cause side effects that will interfere

1    significantly with Defendant's ability to assist in his defense. *See Sell*, 539 U.S. at 181.

2         In sum, the record reveals that the administration of the antipsychotic medications Dr.

3    Sarrazin described in his treatment plan is substantially likely to restore Defendant's competency

4    to participate in court proceedings, that the administration thereof can be closely monitored to

5    avoid or minimize side effects, and that the medication will not interfere significantly with

6    Defendant's ability to assist counsel during these proceedings. Accordingly, the Government has

7    met its burden as to the second *Sell* factor.

8                        C.    Third *Sell* Factor

9         Under the third *Sell* factor, "[t]he court must find that any alternative, less intrusive

10   treatments are unlikely to achieve substantially the same results." 539 U.S. at 181. Defendant

11   does not make any argument as to this factor. For its part, the Government argues Dr. Preston

12   Baecht and Dr. Sarrazin offered uncontradicted testimony that no means less intrusive than

13   involuntary administration of antipsychotic medication would restore Defendant to competency.

14   (ECF No. 72 at 21.) The Court agrees.

15        Dr. Preston Baecht testified that psychotherapy can be an adjunct treatment for individuals

16   with psychotic disorders, but it would not address Defendant's inability to communicate

17   meaningfully and assist in his own defense because of his underlying auditory hallucinations and

18   disorganized thought process. (Hr'g Tr. at 34–35.) Dr. Sarrazin similarly testified that adjunct

19   treatments such as group therapy and other medications could be helpful, but antipsychotic

20   medications are necessary to treat antipsychotic disorders. (*Id.* at 234–235.) Moreover, Dr.

21   Sarrazin's treatment plan calls for less intrusive means than forcibly medicating Defendant,

22   including attempts to gain Defendant's cooperation in taking oral medication. (Gov't Ex. 5 at 1);

23   *Ruiz-Gaxiola*, 623 F.3d at 703 (concluding a requirement in a *Sell* order that the government

24   request the defendant to voluntarily take oral medication before every scheduled administration of

25   medication by injection satisfied the third *Sell* factor because forcible medication would not occur

26   if the defendant consented to taking the medication orally). Dr. Sarrazin testified the "vast

27   majority" of defendants subject to a *Sell* order cooperate and accept oral medication, and he

28   anticipates Defendant will so do as well once the *Sell* order is issued. (Hr'g Tr. at 205–207.)

1    Therefore, the Court finds the administration of the medications about which Dr. Sarrazin

2    testified is the only viable alternative to restore Defendant's competency.  No less intrusive option

3    is likely to achieve substantially the same results.  *See Sell*, 539 U.S. at 181.  As such, the

4    Government has met its burden as to the third *Sell* factor.

5                    D.      Fourth *Sell* Factor

6    Under the fourth *Sell* factor, "the court must conclude that administration of the drugs is

7    medically appropriate, i.e., in the patient's best medical interest in light of his medical condition."

8    539 U.S. at 181.  "[T]he fourth *Sell* factor requires the court to consider all of the medical

9    consequences of the proposed involuntary medication, including those consequences that may not

10   affect the defendant's trial in any way, but result in long term side effects." *Ruiz-Gaxiola*, 623

11   F.3d at 704.

12   Dr. Preston Baecht, Dr. Smith, and Dr. Sarrazin all testified that they would prescribe

13   Defendant antipsychotic medication if he were a private patient outside of the correctional

14   system.  (Hr'g Tr. at 38, 178–179, 235, 294.)  Dr. Preston Baecht and Dr. Sarrazin further

15   testified antipsychotic medications improve the lives of patients suffering from psychotic

16   disorders.  (*Id.* at 33, 230.)  Additionally, Dr. Sarrazin's treatment plan indicates Defendant will

17   be given the lowest possible dose, to be increased only if necessary.  (Gov't Ex. 5 at 1, 1-2.)

18   Defendant has not presented any evidence or argument to suggest the proposed medications are

19   inappropriate for treating psychotic disorders or that the proposed dosages are abnormally high.

20   Accordingly, the Court finds the Government has met its burden to show Dr. Sarrazin's

21   proposed treatment plan is medically appropriate pursuant to the fourth *Sell* factor.  *See Sell*, 539

22   U.S. at 181.

23   **IV.    CONCLUSION**

24   For reasons set forth above, the Government's motion is hereby GRANTED.  (ECF No.

25   72.)  The Bureau of Prisons is authorized to involuntarily administer antipsychotic medication to

26   Defendant consistent with Dr. Sarrazin's treatment plan.  (Gov't Ex. 5.)  The treatment staff at

27   MCFP-Springfield are authorized to involuntarily perform any physical and laboratory

28   assessments and monitoring that are clinically indicated to monitor for medication side effects in

the event Defendant refuses to consent to any of these procedures.  The treatment staff at MCFP-Springfield are allowed the full four-month period of treatment as described in 18 U.S.C. § 4241(d), or a lesser period if reasonably sufficient, to restore Defendant to competency.  Should further treatment be necessary beyond that time, the parties shall file a properly noticed motion to that effect and the Court will assess whether to authorize such treatment.

IT IS SO ORDERED.

DATED:  April 22, 2021

Troy L. Nunley
United States District Judge